# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TURNER ANTHONY BURNETT #506861 | : |
| Plaintiff | : |
| v. | : CIVIL ACTION NO. L-10-1785 |
| ISAIS TESSEMA, M.D.[1] | : |
| COLIN OTTEY, M.D. | |
| MAJD ARNAOUT, M.D. | : |
| LISA SCHINDLER, PAC | |
| CORRECTIONAL MEDICAL SERVICES INC. | : |
| | : |
| Defendants | |

## **MEMORANDUM**

Turner Anthony Burnett ("Burnett"), a resident of Massachusetts incarcerated by the State of Maryland, filed the instant action invoking both diversity jurisdiction under 28 U.S.C. § 1332 and a violation of civil rights under 28 U.S.C. § 1331 and 42 U.S.C. § 1983.[2] Burnett alleges that medical negligence and deliberate indifference to his medical needs led to serious deterioration of his kidneys. He further claims medical personnel failed to timely apprise him of the weakening state of his health and have provided inadequate treatment now that he is in kidney failure.[3]

---

[1] The Clerk shall amend the docket to reflect the proper spelling of Defendants' names.

[2] Plaintiff states venue is appropriate pursuant to 28 U.S.C. § 1391 (b)(2) and asks this Court to exercise supplemental jurisdiction over his state tort claim of negligence under 28 U.S.C. § 1367.

[3] Plaintiff also complains about chronic pain associated with osteoarthritis. Whether the treatment provided for this painful condition has been sufficient is at issue, as well as whether the treatment offered (heavy use of non-steroidal anti-inflammatory drugs) caused or exacerbated Plaintiff's kidney failure. These questions remain unresolved within the context of the pending motions and may be explored after appointment of counsel and amendment of the Complaint.

Pending is a Motion to Dismiss or, in the Alternative, for Summary Judgment filed on behalf of Medical Defendants Tessema, Ottey, Arnaout, Schindler and Correctional Medical Services, Inc. (CMS) ("Medical Defendants"), and Plaintiff's Opposition thereto.[4] ECF Nos. 10 and 17. As the parties have relied on materials outside the scope of the pleadings, the dispositive motions shall be considered motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

After careful review of the record, exhibits, and applicable law, the Court determines that oral argument is not necessary. See Local Rule 105.6 (Md. 2010). For reasons set forth herein, the Court will, by separate Order, DENY Defendants' Motion for Summary Judgment and appoint counsel for Plaintiff.

**I.      Standard of Review**

**Motion for Summary Judgment**

>   Under the 2010 revisions to Fed. R. Civ. P. 56(a) & (c):
>
>   A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
>   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[4] Plaintiff has filed a pro forma Motion for Summary Judgment (ECF No. 16) which presents no reasons for granting same. It will be dismissed. Plaintiff's Motion for Appointment of Counsel (ECF No. 15) shall be granted.

Under Supreme Court standard, this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U. S. 242, 247-48 (1986) (emphasis in original).

The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)); see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240 (4th Cir. 1988).

In conducting the aforementioned analysis, the court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 376-77 (2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Id. at 380.

**Eighth Amendment Right to Medical Care**

In alleging a denial of his Eighth Amendment right to necessary medical care, Plaintiff must present two essential elements. First, he must satisfy the "objective" component by

illustrating a serious medical condition. See Hudson v. McMillian, 503 U.S. 1, 9 (1992); Estelle v. Gamble, 429 U.S. 97, 105 (1976); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). Next, Plaintiff must demonstrate the second "subjective" component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants. See Wilson v. Seiter, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in Estelle, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Id. at 837. Medical staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844; see also Johnson v. Quinones, 145 F.3d at 167.

## II. Background

The Court does not have Plaintiff's full prison medical record for consideration. The parties agree, however, that at the time of his April 5, 2008 transfer to North Branch Correctional Institution (NBCI), Plaintiff's medical history included diagnoses of hypertension ("HTN"),[5] pulmonary embolism ("PE")[6] and gastroesophageal reflux disease ("GERD"). At the time of

---

[5] Hypertension is a condition characterised by persistently high arterial blood pressure that may have no known cause or may be associated with other primary diseases. See Dorland's Illustrated Medical Dictionary (25th Edition) at 744-745. Defendants indicated that HTN can cause chronic renal (kidney) failure. ECF No. 10 at 7.

[6] A pulmonary embolism is a blood clot in blood vessels leading to the lungs. ECF No. 10 at 7 n. 2.

4

transfer, Plaintiff was taking atenolol,[7] hydrochlorothiazide ("HCTZ"),[8] and enalapril (Vasotec)[9] to treat his HTN. He also received low dose aspirin to prevent blockages in the coronary arteries but was not receiving pain medication at that time. ECF No. 10, Exhibit A, ¶ 3.

On April 8, 2008, Physician's Assistant Jody Hammond discontinued Plaintiff's atenolol, enalapril and HCTZ, and substituted lisinopril (Zestril).[10] ACE inhibitors, including lisinopril, can affect kidney function and blood values such as creatinine, and assessment of renal function is important for those receiving the drug.[11] On April 24, 2008, blood chemistry showed Plaintiff's serum creatinine[12] in the high normal range. Plaintiff's Glomerular Filtration Rate ("GFR") was within normal limits.[13] Dr. Tessema evaluated Plaintiff in the Cardiovascular Chronic Care Clinic ("CCCC") on April 29, 2008, and added a 325 mg dose of daily aspirin as protection against PE. ECF No. 10, Exhibit A, ¶ 4.

---

[7] Atenolol is a beta-blocker medication used to treat angina (chest pain) and HTN.

[8] HCTZ is a diuretic (water pill). When first taking HCTZ, the medication limits the body's absorption of salt. Salt causes fluid retention and raises blood pressure. After the patient is on HCTZ for a few weeks, the drug works as a vasodilator, which also helps lower blood pressure. ECF No. 10 at 7 n. 3.

[9] Enalapril is an ACE (angiotensin converting enzyme) inhibitor used to treat HTN. ECF No. 10 at 7 n.5.

[10] Lisinopril also is an ACE inhibitor.

[11] See Physicians' Desk Reference (2006 edition) at 706-708.

[12] Creatinine is produced during the breakdown of creatine phosphate in muscle. It is removed from the body by the kidneys, and it is an indicator of kidney function. If kidney fuction is abnormal, creatinine levels will increase in the blood. Plaintiff's GTP (guanosine triphosphate) level was 141, well outside the normal range of 7-51. Defendants provide no indication of the significance, if any, of this finding.

[13] GFR also reflects kidney function. A decrease in filtration is a sign of kidney disease A calculated GFR of < 60 mL suggests chronic kidney disease if found consistently over at least a three-month period. A calculated result of < 15 mL is consistent with renal failure. ECF No. 10 at 8 n. 8; see also id., Exhibit B at 3.

On May 21, 2008, Registered Nurse Jennifer Giles evaluated Plaintiff's complaint of knee pain.[14] Plaintiff requested x-rays but instead was provided muscle rub and told to return if pain persisted. On May 29, 2008, Registered Nurse Timothy Burdock observed swelling but otherwise normal sensation, movement and pulses in the right knee. Plaintiff was provided 400 mg ibuprofen ("Motrin") three times daily for pain for three days. ECF No. 10, Exhibit A, ¶ 5.

On June 20, 2008, Plaintiff sought help for pain in the hip and back. He was told to present the problem during a July Chronic Care Clinic visit, and provided 20 Motrin (200 mg) to use until then. ECF No. 10, Exhibit B at 11.

Blood chemistry results dated July 17, 2008, show normal levels with the exception of Plaintiff's GTP level which, while still high, had decreased somewhat since the previous report. Id., Exhibit B at 11.

On August 4, 2008, Zantac (ranitidine HCL) was added to Plaintiff's regimen to control GERD. Id., Exhibit B at 12. On August 13, 2008, Plaintiff was examined in the CCCC and informed medical personnel that he had been out of medication for about six days. Examination revealed significant weight gain over the course of one month, blurred vision, and blood pressure of 154/95. Id., Exhibit B at 13. Plaintiff complained that the medications were ineffective and requested he be put back on medications he had received prior to transfer. Plaintiff also indicated he was suffering headaches. ECF No. 17, Affidavit at 2, ¶ 3. Dr. Colin Ottey noted Plaintiff's control of HTN was poor and his status had worsened. Ottey scheduled bloodwork and x-rays of the right knee and hip "due to arthritis" and added 400 mg, three times daily, for arthritic pain and instructed a follow-up visit in one month to assess knee and hip pain. Id.,

---

[14] It is unclear whether this was Plaintiff's first complaint of knee pain while incarcerated, or whether his knee problems became apparent while he was housed at other Division of Correction institutions prior to transfer to NBCI.

Exhibit B at 15-16. Test results on September 2, 2008 showed a low carbon dioxide level and high GTP. Id., Exhibit B at 17.

By October 23, 2009, Plaintiff had lost nine pounds but continued to show mild swelling of the right knee. Id., Exhibit B at 18. Plaintiff did not appear for his November 7, 2008 medical appointment. Id., Exhibit B at 19. He was examined in the Chronic Care Clinic on November 20, 2008, with a recommended three-month follow-up. His blood pressure was high, 150/100. Dr. Hoski added HCTZ to Plaintiff's prescription regimen to lower blood pressure. Id., Exhibit B at 20-22.

On January 20, 2009, Plaintiff submitted a sick call request complaining of high blood pressure and frequent headaches. Id., Exhibit B at 23. On January 22, 2009, his medications were adjusted to include, in addition to the aspirin, Zestril and Zantac already prescribed, additional HCTZ and three daily doses of ibuprofen. Id., Exhibit B at 24. On January 25, 2009, Plaintiff reported to the medical department requesting a blood pressure check and complaining of intermittent headaches. His blood pressure was 143/88. Id., Exhibit B at 25.

On March 16, 2009, Plaintiff reported to the medical department complaining of stomach pain and headache. His blood pressure was 184/102, prompting the nurse to contact Dr. Ottey, who ordered that Plaintiff receive clonipine[15] 0.2 mg and have his blood pressure rechecked in 20 minutes. Id., Exhibit B at 27. Plaintiff indicated his blood pressure was not controlled because he had run out of medication. Id., Exhibit B at 28. After clonipine was administered, Plaintiff's blood pressure was recorded at 132/90. Id. at 29.

On April 4, 2009, Plaintiff sought medical authorization for a bottom bunk due to arthritis and requested Glucosamine/Chondroitin nutritional supplements for arthritis. Blood pressure

---

[15] Clonipine works on brain receptors to decrease blood pressure. See Physicians' Desk Reference (25th Edition) at 876.

readings of 186/108 and 172/96 were noted. The supplements and B vitamins were ordered, and Plaintiff was continued on 400 mg ibuprofen three times a day. Id., Exhibit B at 31. A diuretic, Maxide, was prescribed on April 10, 2009.

On May 14, 2009, blood work revealed that Plaintiff's GFR reading was abnormally low. ECF No. 10, Exhibit B at 27-39, 118-19, 146.

On July 27, 2009, Plaintiff reported he had been without blood pressure medication for 17 days and had not been seen in the CCCC. On August 2, 2009, he again sought medical help, indicating his medications were discontinued and he had constant headaches. Id., Exhibit B at 42. He received a refill for lisinopril on August 5, 2009, at which time his blood pressure was 122/74, a normal reading. ECF No. 10, Exhibit B at 40. Plaintiff's medications, including ibuprofen, were continued during a Chronic Care Visit on August 30, 2009. At that time, his blood pressure was 126/84, again within normal limits. Id., Exhibit B at 40-48, 120-123.

On September 10, 2009, Plaintiff's GFR was 44, below normal limits. Id., Exhibit B at 48.

On November 7, 2009, Plaintiff indicated he had been without blood pressure medications for eight days. Lisinopril was reordered and Plaintiff received it that same day. Id., Exhibit B at 49-52, 124-27.

On December 7, 2009, Physicians' Assistant Schindler renewed Plaintiff's ibuprofen prescription. Id., Exhibit B at 50-53, 128-35.

Plaintiff's kidney deterioration continued. On January 8, 2010, for the third consecutive time, Plaintiff's GFR fell, this time to 41. Id., Exhibit B at 54-55. On February 25, 2010, Plaintiff refused to allow blood to be drawn. Id. He states that by that point he had become "suspicious" because of the frequency of the testing. ECF No. 17, Affidavit at 6, ¶ 16. By

March 8, 2010, he allowed blood to be drawn but demanded information as to the result. The GFR was 34. ECF No. 17, Affidavit at 6, ¶¶ 17-18; ECF No. 10, Exhibit B at 56-60.

On May 12, 2010, Plaintiff was evaluated for knee pain by Dr. Majd Arnaout. Plaintiff states that Dr. Arnaout told him he was in renal failure due to heavy use of ibuprofen and nutritional supplements. ECF No. 17, Affiavit at 7, ¶ 21. Dr. Arnaout indicates Plaintiff agreed with his decision to discontinue lisinopril, Maxide and ibuprofen and substitute amlodipine, HCTZ and acetaminophen, and to refer Plaintiff to a nephrologist. Dr. Arnaout placed Plaintiff on a renal diet and ordered renal ultrasound. By May 27, 2010, Plaintiff's GFR remained low at 44. ECF No. 10, Exhibit B at 61-70, 136-38.

Renal ultrasound was unremarkable for cysts, tumors or stones that could be implicated in Plaintiff's renal disease. On June 11, 2010, Plaintiff stopped his renal diet, stating it was not compatible with his religious beliefs, and refused to have blood drawn. ECF No. 10, Exhibit B at 71-75.

On June 23, 2010, Dr. Robert Welik, a nephrologist, evaluated Plaintiff and recommended discontinuing HCTZ, and substituting Vasotec as a blood pressure medication and Ultram or Darvocet as pain medication. A low sodium diet and further laboratory tests also were recommended. Plaintiff was to return to Welik in one month. ECF No. 10, Exhibit B at 76-80. On July 5, 2010, the recommended lab work was ordered. On July 30, 2010, Plaintiff refused the testing. ECF No. 10, Exhibit B at 81-96.

On August 2, 2010, Schindler prescribed the recommended medications. Plaintiff began receiving Vasotec on August 4, 2010. Dr. Arnaout discussed pain medication with Plaintiff at that time and continued Plaintiff on high-dose acetaminophen for pain relief. On August 11,

2010, Plaintiff complained of bleeding gums, attributing the problem to amlodipine. ECF No. 10, Exhibit B at 97-99, 139.

On August 3, 2010, Plaintiff's blood pressure was 140/90, which is high normal. Dr. Arnaout increased Plaintiff's Vasotec dosage and stopped the amlodipine. ECF No. 10, Exhibit B at 100-03, 140.

On September 2, 2010, Plaintiff's GFR remained low, at 52. Vasotec was again increased to control blood pressure. ECF No. 10, Exhibit B at 141-45.

### III. Analysis

Essentially, Plaintiff complains that he was improperly medicated for arthritic pain through the long-term use of high doses of ibuprofen which, when combined with poorly controlled HTN, led to rapid deterioration of his kidneys. He claims that he was not timely advised of his failing health or otherwise kept abreast of test results and other relevant medical information, and further alleges diagnosis and treatment for his arthritic condition is unresolved. Finally, Plaintiff asserts that Defendants refuse to address and treat the psychological problems brought on by these health concerns.

Plaintiff, a self-represented prisoner – without discovery or assistance of counsel – has provided well-written responses and documentary evidence to support his negligence and Eighth Amendment claims. Additional inquiry is required.

### IV. Conclusion

For the foregoing reasons, the Court will, by separate Order:

(i) DENY Defendants' Motion for Summary Judgment;

(ii) DENY Plaintiff's Motion for Summary Judgment;

(iii) DENY Plaintiff's request for oral argument; and

(iv) GRANT Plaintiff's request for appointment of counsel.

Dated this 14th day of June 2011.

/s/
_____
Benson Everett Legg
United States District Judge